

**null / ALL**
**Transmittal Number: 29057872**
**Date Processed: 05/07/2024**

# Notice of Service of Process

| | |
|---|---|
| Primary Contact: | SOP UPS - United Parcel<br>SOP - PowerBrief - Wilmington<br>251 Little Falls Dr<br>Wilmington, DE 19808-1674 |
| Electronic copy provided to: | Sonja Jackson<br>Arlette Willis |

| | |
|---|---|
| **Entity:** | United Parcel Service, Inc.<br>Entity ID Number  2551129 |
| **Entity Served:** | United Parcels Service, Inc |
| **Title of Action:** | Daniel Moyle vs. United Parcels Service, Inc. |
| **Matter Name/ID:** | Daniel Moyle vs. United Parcels Service, Inc. (15669669) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Class Action |
| **Court/Agency:** | Kings County Supreme Court, NY |
| **Case/Reference No:** | 503187/2024 |
| **Jurisdiction Served:** | New York |
| **Date Served on CSC:** | 05/02/2024 |
| **Answer or Appearance Due:** | 20 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | T.A. Blackburn Law, PLLC<br>347-342-7432 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

Case 1:25-cv-05548-DG-CHK    Document 1-2    Filed 10/02/25    Page 2 of 45 PageID #: 77

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF KINGS**

DANIEL MOYLE,
ROY WELSH,
CARLOS PALAGUACHI,
ROBERT SANTIAGO,
AHMED RADWAN,
TYLER LILLY,
TRAVIS STEELE,
and
WARREN PAYNE,
*individually and on behalf of others similarly situated,*

                                        Plaintiffs,

                -against-

UNITED PARCELS SERVICE, INC.
                                        Defendant.

| |
|---|
| Index Number:<br>**Plaintiff designates**<br>**Kings County**<br>**as the venue for trial.** |

| |
|---|
| DEMAND FOR JURY TRIAL<br>CLASS ACTION COMPLAINT<br>UNDER N.Y. CPLR § 901 |

To the above-named defendant (s):

YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer or, if the complaint is not served with this summons, to serve a notice of appearance on the Plaintiffs' Attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York): and in case your failure to appear or answer, judgment will be taken for the relief demanded herein.

A COPY OF THIS SUMMONS WAS FILED WITH THE CLERK OF THE COURT, KINGS COUNTY ON _____ IN COMPLIANCE WITH CPLR §§305(a) AND 306(a).

Dated: New York, New York

January 28, 2024

| By: | _____/s/ Tyrone Blackburn_____ |
|---|---|
| | Tyrone A. Blackburn, Esq. |

| By: | _____ |
|---|---|
| | Kevin Mahoney, Esq. |

| By: | _____ |
|---|---|
| | Berkeh Alemzadeh, Esq. |

| By: | _____ |
|---|---|
| | Rodney Diggs, Esq. |

1

Case 1:25-cv-05548-DG-CHK    Document 1-2    Filed 10/02/25    Page 3 of 45 PageID #: 78

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF KINGS**

DANIEL MOYLE,
ROY WELSH,
CARLOS PALAGUACHI,
ROBERT SANTIAGO,
AHMED RADWAN,
TYLER LILLY,
TRAVIS STEELE,
and
WARREN PAYNE,
*individually and on behalf of others similarly situated,*

Plaintiffs,

-against-

UNITED PARCELS SERVICE, INC.

Defendant

Index Number:
**Plaintiff designates**
**Kings County**
**as the venue for trial.**

DEMAND FOR JURY TRIAL
CLASS ACTION COMPLAINT
UNDER N.Y. CPLR § 901

Daniel Moyle ("Plaintiff Moyle" or "Mr. Moyle"), Roy Welsh ("Plaintiff Welsh" or "Mr. Welsh"), Carlos Palaguachi ("Plaintiff Palaguachi" or "Mr. Palaguachi"), Robert Santiago ("Plaintiff Santiago" or "Mr. Santiago"), Ahmed Radwan ("Plaintiff Radwan" or "Mr. Radwan"), Travis Steele ("Plaintiff Steele" or "Mr. Steele"), Tyler Lilly ("Plaintiff Lilly" or "Mr. Lilly") and Warren Payne ("Plaintiff Payne" or "Mr. Payne") (Collectively, "Plaintiffs") individually and on behalf themselves and others similarly situated, by and through their attorneys, Tyrone Blackburn Esq, of T. A. Blackburn Law, PLLC., Rodney S. Diggs, Esq., of IVIE McNEIL WYATT PURCELL & DIGGS and Kevin Mahoney, Esq. and Berkeh Alemzadeh, of Mahoney Law Group, APC, upon their knowledge and belief, and as against Defendant's United Parcels Service, Inc. d/b/a UPS ("Defendant") alleges as follows:

## NATURE OF ACTION:

### New York Labor Law Class Claims:

1. This action is brought under New York Labor Law, specifically N.Y. Labor Law § 190 et seq. and 650 et seq. (The "NYLL"), NYLL § 190 et seq. and 663 et seq., NYLL § 195 (1), NYLL § 195 (3), NYLL § 195 (4), 12 NYCRR § 142-2.2, NYLL, Article 6, § 198 (1-d), and CPLR § 901(a)(1) on behalf of the Plaintiffs and a putative class of individual who furnished labor, and

2

more specifically, were Delivery Drivers for Defendants UPS, its management and/or agents, and more specifically, William Grey and Lloyd Hall and/or any other entities affiliated with or controlled by Defendant UPS to recover unpaid wages and overtime wages for work performed for Defendants by Plaintiffs and other members of the putative Class. The plaintiffs seek monetary and declaratory relief to redress the Defendant's intentional violation of the plaintiff' and putative class members' workplace rights, including but not limited to failure to pay minimum wages, overtime wages, and back wages.

2. Beginning in approximately April 2014 and upon information and belief, continuing through the present, alleges that Defendants maintained a policy and/or practice against Plaintiffs, putative class members, and other similarly situated employees wherein Defendant required Package Delivery Drivers to work an excess of forty (40) hours a week without providing the required minimum wage and/or overtime compensation as required by New York Labor Law § 652.

3. Beginning in approximately April 2014 and upon information and belief, continuing through the present, alleges that Defendants maintained a policy and/or practice against Plaintiffs and putative class members wherein Defendants failed to provide Plaintiffs and putative class members with paystubs that correctly reflected the number of hours worked, as well as the rate of pay for all hours worked as required by New York Labor Law § 195(3).

4. The named Plaintiffs, putative class members, and other similarly situated employees seek relief for the Defendant's violation of N.Y. Labor Law § 190 et seq. and 650 et seq. (The "NYLL"), NYLL § 190 et seq. and 663 et seq., NYLL § 195 (1), NYLL § 195 (3), NYLL § 195 (4), 12 NYCRR § 142-2.2, NYLL, Article 6, § 198 (1-d), and CPLR § 901(a)(1).

5. Plaintiffs Palaguachi, Santiago, Radwan, Lilly, Steele, Moyle, Welch, and Payne now bring this action on behalf of themselves and other similarly situated employees for unpaid minimum, overtime wages, and back wages according to N.Y. Labor Law § 190 et seq. and 650 et seq. (The "NYLL"), including applicable liquidated damages, interest, attorneys' fees, and costs.

6. Plaintiffs Palaguachi, Santiago, Radwan, Lilly, Steele, Moyle, Welch, and Payne seek certification of this action as a class action on behalf of themselves individually, former employees, and all other similarly situated employees who do not elect to opt out of this action

Case 1:25-cv-05548-DG-CHK     Document 1-2     Filed 10/02/25     Page 5 of 45 PageID #: 80

according to N.Y. Labor Law § 190 et seq. and 650 et seq. The purported Class comprises of Delivery Drivers in the state of New York.

## **PRIOR FILING**

7.  On or about, March 18, 2020, this case was filed in the Eastern District of New York, Case name and number: Murray et al. v. UPS et al., 1: 20-cv-1427 ("Federal Case").

8.  On or about October 26, 2023, the Federal Case was dismissed without prejudice.

9.  Pursuant to CPLR § 205(a), a claim for anything other than "voluntary discontinuance, a failure to obtain personal jurisdiction over the defendant, a dismissal of the complaint for neglect to prosecute the action, or a final judgment upon the merits" that is dismissed without prejudice may be refiled as a new action within six months of its dismissal, provided that it was timely when originally filed. CPLR § 205(a); *see Ross v. Jamaica Hosp. Med. Ctr.*, 122 A.D.3d 607, 607-08, 996 N.Y.S.2d 118 [2d Dept 2014]. *Bartholomew v. N.Y.C. Health & Hosps. Corp.*, 2023 NY Slip Op 32792(U), ¶ 3 (Sup. Ct.). Here, the Federal case was timely filed, and this refiled New York State case is also timely filed pursuant to <u>Bartholomew.</u>

## **JURISDICTION AND VENUE**

10. This Court has personal jurisdiction over Defendants under and consistent with the Constitutional requirements of Due Process in that Defendants, acting directly or through their agents or apparent agents, committed one or more of the following:

    a.  The transaction of any business within the state;

    b.  The making of any contract within the state;

    c.  The commission of a tortious act within this district; and

    d.  The ownership, use, or possession of any real estate in this state.

11. The venue is proper because all, or a substantial portion of, the events or omissions giving rise to the claims occurred in this county, Defendant UPS maintains several branches and offices within this county, and Defendant UPS operates a package delivery business located in this county. Further, Plaintiffs are or were employed by Defendant UPS in this county.

Case 1:25-cv-05548-DG-CHK    Document 1-2    Filed 10/02/25    Page 6 of 45 PageID #: 81

## PARTIES

**NYLL Plaintiffs:**

12. Plaintiff Daniel Moyle is an adult, English-speaking Caucasian male who resides in Bronx County, New York. Defendant United Parcels Service employed plaintiff Moyle from approximately July 9, 2012, to August 21, 2019.

13. Plaintiff Roy Welsh is an adult, English-speaking Caucasian male who resides in New Orleans, Louisiana. Plaintiff Welsh is Jewish, and he is religiously observant. Plaintiff Welsh was employed by Defendant United Parcels Service from approximately June 26, 2016, until July 20, 2019.

14. Plaintiff Carlos Palaguachi is an adult, Spanish-speaking Latinx male who resides in Bronx County, New York. Defendant United Parcels Service employed plaintiff Palaguachi from approximately October 2017 until May 2018.

15. Plaintiff Warren Payne is an adult, English-speaking African-American male who resides in Kings County, New York. Defendant United Parcels Service employed plaintiff Payne from approximately August 2017 until June 2018.

16. Plaintiff Robert Santiago is an adult, English, and Spanish-speaking male who resides in Kings County, New York. Plaintiff Santiago was employed by Defendant United Parcels Service from approximately April 7, 2014, until October 18, 2020.

17. Plaintiff Ahmed Radwan is an adult, English, and Arabic-speaking male who resides in Kings County, New York. Plaintiff Radwan was employed by Defendant United Parcels Service from approximately July 2018 until October 1, 2018.

18. Plaintiff Travis Steele is an adult, English, and Hebrew-speaking male who resides in Kings County, New York. Defendant United Parcels Service employed plaintiff Steele from approximately September 2014 until May 2021.

19. Plaintiff Tyler Lilly is an adult, English, and Spanish-speaking male who resides in Kings County, New York. Defendant United Parcels Service employed plaintiff Lilly from approximately November 2019 until March 2022.

20. Plaintiff Payne consents to be a party plaintiff according to N.Y. CLS CPLR § 901 and brings these claims based upon the allegations herein as a representative party of a prospective class of similarly situated individuals under N.Y. CLS CPLR § 901.

5

21. Plaintiff Palaguachi consents to be a party plaintiff according to N.Y. CLS CPLR § 901 and brings these claims based upon the allegations herein as a representative party of a prospective class of similarly situated individuals under N.Y. CLS CPLR § 901.

22. Plaintiff Steele consents to be a party plaintiff according to N.Y. CLS CPLR § 901 and brings these claims based upon the allegations herein as a representative party of a prospective class of similarly situated individuals under N.Y. CLS CPLR § 901.

23. Plaintiff Radwan consents to be a party plaintiff according to N.Y. CLS CPLR § 901 and brings these claims based upon the allegations herein as a representative party of a prospective class of similarly situated individuals under N.Y. CLS CPLR § 901.

24. Plaintiff Santiago consents to be a party plaintiff according to N.Y. CLS CPLR § 901 and brings these claims based upon the allegations herein as a representative party of a prospective class of similarly situated individuals under N.Y. CLS CPLR § 901.

25. Plaintiff Lilly consents to be a party plaintiff according to N.Y. CLS CPLR § 901 and brings these claims based upon the allegations herein as a representative party of a prospective class of similarly situated individuals under N.Y. CLS CPLR § 901.

26. Plaintiff Welsh consents to be a party plaintiff according to N.Y. CLS CPLR § 901 and brings these claims based upon the allegations herein as a representative party of a prospective class of similarly situated individuals under N.Y. CLS CPLR § 901.

27. Plaintiff Moyle consents to be a party plaintiff according to N.Y. CLS CPLR § 901 and brings these claims based upon the allegations herein as a representative party of a prospective class of similarly situated individuals under N.Y. CLS CPLR § 901.

*Defendants*

28. Defendant UPS, an Atlanta, Georgia corporation, owns, operates, or controls a package delivery service business at all relevant times, located at 10401 Foster Avenue, Brooklyn, NY 11236, under the name "United Parcel Service, Inc."

## CLASS ACTION ALLEGATIONS

29. Plaintiffs, putative Class, and similarly situated employees bring the NYLL claims under N.Y. CLS CPLR § 901 on behalf of themselves and a class of persons consisting of:

6

Case 1:25-cv-05548-DG-CHK    Document 1-2    Filed 10/02/25    Page 8 of 45 PageID #: 83

**All persons who work or have worked as delivery drivers for Defendant Corporation in the State of New York between 2014 and the date of final judgment in this matter (the "Class").**

30. The Class Members are so numerous that the joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court.

31. Plaintiffs' claims are typical of the claims of the Class, and the relief sought is typical of the relief sought by the Class.

32. The Plaintiffs and the putative class members have all been injured in that they have been uncompensated and/or under-compensated due to Defendants standard policies, practices, and patterns of conduct.

33. Defendant UPS's corporate-wide policies and practices affected all Class Members similarly, as the Class Members were subject to Defendants' policies and practices statewide.

34. Defendants benefited from the unfair, wrongful, and unlawful treatment they visited upon each Class Member.

35. Plaintiffs will fairly and adequately protect the interests of the Class and have no interests antagonistic to the Class[1].

36. Plaintiffs are represented by attorneys who are experienced and competent in employment law and, more specifically, wage-an-hour class actions.

37. A class action is superior to other available methods for the fair and efficient adjudication of the controversy – particularly in the context of wage and hour litigation where individual class members lack the financial resources to prosecute a lawsuit against a corporate defendant vigorously.

38. Class action treatment will permit similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender.

39. Common questions of law and fact exist as to the Class and predominate over any questions affecting individual Class Members, including but not limited to the following:

    a. Whether Defendants failed to compensate the Class Members for all hours worked at their regular rate(s) of pay [**NY CLS Labor § 191**];

    b. Whether Defendants failed to compensate Class Members for hours worked more than forty (40) per workweek under [**12 NYCRR § 142-2.2**];

---

[1] Plaintiffs are prepared to sever all unrelated causes of action in an effort to preserve the integrity of the class action.

Case 1:25-cv-05548-DG-CHK    Document 1-2    Filed 10/02/25    Page 9 of 45 PageID #: 84

c. Whether Defendants failed to furnish Class Members with accurate statements with every payment of wages, as required by the NYLL [**NY CLS Labor § 195**];

d. Whether Defendants failed to maintain and preserve contemporaneous, true, and accurate payroll records for the Class Members, showing for each week worked, the rate or rates of pay, and basis thereof, as required by the NYLL [**NY CLS Labor § 195 [4]**;

e. Whether Defendants failed to provide Class Members with paystubs that accurately reflect their hours worked, rate of pay, and amount paid, as required by the NYLL [**NY CLS Labor § 195 [3]**];

40. The nature and extent of the class-wide injury and the measure of damages for those injuries/

## **FACTUAL ALLEGATIONS**

### *Defendants Constitute Joint Employers*

41. Upon information and belief, Defendant UPS operates a package delivery service throughout the New York State.

42. Defendant UPS possessed substantial control over Plaintiffs and the Class working conditions, wherein its policies and practices concerning Plaintiffs and Class Members' employment and compensation were uniformly implemented with respect to Plaintiffs and the Class.

43. Defendant UPS employed Plaintiffs, the Class, and all similarly situated employees and is their employer within the meaning of N.Y. CLS CPLR § 901et seq. and the NYLL.

44. In the alternative, Defendant UPS constitutes a single employer of the Plaintiff, the Class, and all similarly situated employees.

45. At all relevant times, Defendant UPS are the employer within the meaning of the NYLL. Defendant had the power to hire and fire, controlled the terms and conditions of employment, and determined the rate and method of compensation for Plaintiffs and the Class.

### *Defendants Engaged In Wage Theft*

46. Plaintiffs allege that Defendants stole hundreds of hours of overtime from Plaintiffs and the Class.

47. Plaintiffs further allege that many Class Members start work at 7 a.m. or 9 a.m. and punch out at 10 p.m. or 11 p.m., which amounts to working up to sixteen (16) hours per day at times.

8

Case 1:25-cv-05548-DG-CHK    Document 1-2    Filed 10/02/25    Page 10 of 45 PageID #: 85

    a.   Plaintiffs further allege that Plaintiffs and the Class worked anywhere from an average of ten (10) to sixteen (16) hours a day, which is a 5-day work week, Plaintiff and the Class work an average of fifty (50) to eighty (80) hours a week.

48. Plaintiffs also allege that the Class, on average, worked six (6) days a week, which amounted to anywhere from eighty (80) to ninety (90) hours per week; however, Defendants failed to compensate Plaintiffs and the Class for all hours worked in a week.

49. Plaintiffs allege that they have first-hand knowledge of the scheme by Defendants to steal overtime hours from Plaintiffs and the Class.

50. Plaintiffs allege that Defendants would go into the GTS (Global Timecard System) and unilaterally change the delivery drivers' punch-in and punch-out times without authorization from the Class Members in order to not have to pay both minimum and overtime wages.

51. Defendants' unlawful policies and/or practices worked solely for the benefit of Defendants, in that Defendants were able to retain unlawfully the wages of Plaintiffs and the Class for hours worked.

52. Plaintiffs further allege that Defendants engaged in a pattern and/or practice of manipulating Plaintiffs and Class Members' time, solely for the benefit of Defendants, which is in violation of the Department of Transportation ("DOT") rules and regulations and more specifically § 395.3 Maximum driving time for property-carrying vehicles. [**49 CFR 395.3**].

53. Plaintiffs also allege that Defendants knowingly and willfully required Plaintiffs and the Class to work beyond their allotted DOT hours.

54. Plaintiffs further allege in addition to the harm visited against the Class members, Defendants required On-Road-Supervisors to work anywhere from fifteen (15) to eighteen (18) hours a day, knowing that On-Road-Supervisors hours are not recorded because they are not required to punch in or punch out, which allowed Defendants to violate [**49 CFR 395.3**].

*Individual Plaintiffs*

**PLAINTIFF DANIEL MOYLE**

55. Plaintiff Moyle is a former employee of Defendant UPS who was employed as a Business Manager, On-Road-Supervisor, and Delivery Driver. With over seven (7) years of experience working for UPS, first as a package delivery driver, then as an On-Road-Supervisor, and

9

ending as a Business Manager. Plaintiff Moyle is more than qualified to have worked as a Business Manager for UPS.

56. Defendant UPS employed Mr. Moyle from approximately July 9, 2012, until August 21, 2019.

57. As an "On-Road Supervisor, Mr. Moyle's work duties required neither discretion nor independent judgment.

58. Mr. Moyle is a whistleblower who raised complaints regarding document manipulation, fraudulent reporting of accidents, (DOT) hours of service violations, massive overtime theft of the driver and "On-Road Supervisors, as well as other abuses by Defendant UPS by and through its management.

59. Mr. Moyle sustained substantial psychological and monetary injuries due to the hostile work environment he was subjected to while an employee of UPS-by-UPS senior management.

60. Mr. Moyle has first-hand knowledge of UPS violating the U.S. Department of Labor's wage and hour laws.

61. UPS senior management stole hundreds of hours of overtime from a class of drivers. Mr. Moyle has evidence of some drivers working seventeen (17) to eighteen (18)-hour shifts. The plaintiffs allege that all overtime hours were not reflected on the driver's paychecks.

62. Mr. Moyle is prepared to reveal the scheme that UPS senior management instructed the Business Manager to execute regarding stealing overtime hours from the delivery drivers.

63. Mr. Moyle is prepared to reveal how managers and supervisors would go into the GTS and change the delivery drivers' punch-in and punch-out times. This illegal act reduces the driver's daily and weekly hours worked.

64. Upon information and belief regarding the DOT violations, Mr. Moyle has witnessed countless hours of DOT hour manipulation. The stolen time is a pattern and practice of the company and its management team to manipulate the DOT rules and regulations.

65. Upon information and belief, UPS senior managers knowingly and willfully require on-road supervisors and Business Managers to work beyond their allotted DOT hours.

66. Upon information and belief, over his 7-year career at UPS, Mr. Moyle was under constant pressure from his superiors to engage in unethical and illegal activities to cheat workers, customers, and insurance carriers.

67. Upon information and belief, the mafia-like bullying tactics were not just used against Mr. Moyle but were used as a common tactic to get business done across the board. Mr. Moyle has

Case 1:25-cv-05548-DG-CHK    Document 1-2    Filed 10/02/25    Page 12 of 45 PageID #: 87

evidence to prove that UPS bosses – throughout the organization, promote the falsification of company records to mislead customers, lower insurance premiums, and make their internal balanced scorecards look more favorable.

68. Upon information and belief, Mr. Moyle is prepared to demonstrate how UPS uses its shoddy and unethical business practices to discipline or discharge its employees at any time arbitrarily and for disguised reasons – such as age, disability status, race, or whether the individual is part of the "in-crowd."

69. Upon information and belief, Mr. Moyle worked for Tommy Francis when he first entered UPS and was a supervisor. Tommy Francis taught Mr. Moyle how to cover up crashes and injuries by often dispatching Mr. Moyle to the scene of a crash and asking Mr. Moyle to pay for minor damages with his own money.

70. Upon information and belief, Tommy Francis thought the number of crashes he covered up was amusing. Tommy Francis kept a little black book containing a log of all the injuries and accidents he covered up. Mr. Moyle knew that if he defied Tommy Francis, it would hurt his career.

71. Tommy Francis required everyone who worked under him to cheat.

*Mr. Moyle Blows The Whistle On An Accident Coverup*

72. Upon information and belief, during the First Quarter of 2019, one of Mr. Moyle's drivers, Ramadan Abdul–Salaam, reported to his supervisor, Reinaldo Madera, that he slipped and fell. Reinaldo Madera, Rey, and Alex De La Rosa went to the scene and spoke with him.

73. Approximately two (2) weeks later, Mr. Abdul-Salaam approached Mr. Moyle and informed him that his leg was still nagging him, and he felt that he needed medical attention.

74. Mr. Moyle called Chance Stewart to report the injury. Chance Stewart instructed Mr. Moyle to suppress the injury. At that point, Mr. Abdul-Salaam had already seen his doctor and sent Mr. Moyle a doctor's note.

75. While disregarding Mr. Abdul-Salaam's doctor's note, Chance Stewart sent Mr. Moyle a text message: "Also Call Tony Hussein. Do u have his number." Tony Hussain is a driver at the 43rd Street Facility. Tony Hussein has a common nickname known throughout the North Atlantic District – "The Safety Mafia." Tony Hussein works hand in hand with the facility

11

manager, Justin Laporte, and together, they cover up crashes and injuries as they occur. Tony Hussein is known to make accidents and injuries go away.

76. Tony Hussein, the Safety Mafia, is a veteran delivery driver who is always readily available to take calls for help from managers and supervisors. After fielding accident calls, Tony Hussein rushes out to the scene and convinces drivers to either not report an injury or help sweep an accident under the rug. Upon information and belief, Tony Hussein made an injured UPS driver exit an ambulance and not report his accident injury.

77. Ignoring Tony Hussein's pressure campaign, Mr. Moyle officially reported Mr. Abdul-Salaam's injury. Mr. Moyle's actions angered Chance Stewart and landed Mr. Moyle in a heap of trouble.

### *Mr. Moyle Is Retaliated Against For Reporting Mr. Abdul-Salaam's Injury*

78. Upon information and belief, after Mr. Moyle went against Chance Stewart and Tony Hussein's wishes and reported Mr. Abdul-Salaam's injury, he was approached by Chance Stewart to engage in another coverup. This time, Chance Stewart demanded that Mr. Moyle work with Tony Hussein regarding a crash in a center managed by Manny Pujols. Mr. Moyle refused, and that spelled the beginning of the end of his tenure at UPS.

79. Upon information and belief, Chance Stewart was on a mission to make Mr. Moyle's life a living hell.

80. Chance Stewart began by requesting that Terri Murphy, the Metro New York Safety Manager, launch an "investigation" into Mr. Moyle concerning Mr. Abdul-Salaam's injury.

81. Although he was aware of Mr. Abdul-Salaam's injury at the time, Chance Stewart falsely reported Mr. Moyle for failing to report Mr. Abdul-Salaam's injury, resulting in a "Lost Time." injury.

82. As the safety manager for the New York Metro region, Terri Murphy orchestrates and promotes many tactics for covering up injuries and accidents.

83. Upon information and belief, injuries, accidents, and, more specifically, lost time injuries are all negative hits on Terri Murphy's balanced scorecard. Upon receiving Chance Stewart's complaint, Terri Murphy was furious that she was charged with this severe blemish on her balance scorecard.

12

84. Terri Murphy directly threatened Mr. Moyle on several occasions. On one of those occasions, Terri Murphy said, "This injury better not go lost time!"

85. Upon information and belief, the rules only apply to some. As a result of Mr. Moyle reporting Mr. Abdul-Salaam's injury, he was subjected to conference call harassment, public ridicule, threats of termination, heightened scrutiny of his work product, excessive, unnecessary additional training, and harassment by company security.

86. Mr. Moyle is aware of UPS's pattern and practice of punishing managers who speak up, and it's called "grinding. "Mr. Moyle suffered an immediate increase in the hours he was required to work. Mr. Moyle went from working forty (40) to five (45) hours a week to being required to work 60 to 70 hours a week.

### *Mr. Moyle Suffered From Depression and Severe Anxiety*

87. During the spring of 2019, the stress and pressure became too much for Mr. Moyle. As a United States Marine Corps war veteran, Mr. Moyle's integrity and honor were being attacked.

88. Mr. Moyle was being punished for going against Chance Stewart and Terri Murphy by reporting the injury of Mr. Abdul-Salaam. He was required to work longer hours and was threatened with being relocated to a branch over a hundred miles from his home.

89. Mr. Moyle has witnessed countless supervisors and managers get rotated to undesirable locations far from their homes and required to work undesirable hours if they go against UPS management.

90. For example, in 2018, during Mr. Moyle's time as the Knickerbocker manager in Manhattan South, Mr. Moyle covered his manager's entire operation when Frank Casalino took a vacation.

91. During one particular week that Mr. Moyle was covering, Brian Cannon, Frank Casalino's manager, reached out to Mr. Moyle for an update on the Manhattan South operation.

> Brian replied, "Nice job, how come Manhattan South can't do it when Frank is there? All roads lead to Frank. He fucking sucks. I can't wait to send that guy packing."

92. Shortly after, Brian Cannon was promoted to president of the North Atlantic District, and shortly after that, he did exactly what he promised. He sent Frank packing.

93. Brian Cannon sent Frank Casalino to an operation in upstate New York. One of Frank's buildings was located over 100 miles away from his home. This goes against the maximum

13

Case 1:25-cv-05548-DG-CHK    Document 1-2    Filed 10/02/25    Page 15 of 45 PageID #: 90

miles outlined by UPS company policy. This was all done solely to intimidate and harass Mr. Moyle.

94. Upon information and belief, it was a known fact that Brian didn't like Frank, even poking fun at him during meetings. Now Brian was in a position where he could make Frank miserable – and he did.

### *Mr. Moyle Goes on Short-Term Disability and Is Notified That He Is Being Demoted and Reassigned To Upstate New York*

95. Mr. Moyle's depression came to a head on May 9, 2019, when he was summoned to the 43rd Street office to be interviewed by security.

96. Chance Stewart and Terri Murphy implemented this game to retaliate against Mr. Moyle. They subjected Mr. Moyle to constant drilling and fake investigations from UPS company security.

97. This constant harassment caused Mr. Moyle to have a panic attack, which resulted in a diagnosis of depression and severe anxiety.

   a. Mr. Moyle was out on medical leave for 3.5 months.

   b. Mr. Moyle's doctor prescribed Lorazepam.[2] and Duloxetine[3].

   c. The side effects of Lorazepam:

      i. Drowsiness, dizziness, loss of coordination, headache, nausea, blurred vision, change in sexual interest/ability, constipation, heartburn, or appetite change.

   d. The side effects of Duloxetine:

      i. Difficulty sleeping, headaches, dizziness, blurred vision, and constipation or diarrhea.

98. Forty (40) days into his disability leave, Mr. Moyle's position as the Knickerbocker manager was given to Brian Mactavish. Mr. Moyle then learned through Leo Cummings (Chance Stewart's supervisor) and Chance Stewart that he would be relocated to a location in Upstate New York upon his return.

99. Mr. Moyle had a conversation with Leo Cummings and Chance Stewart one (1) month before his medical leave was scheduled to end. Mr. Moyle informed them that he would need the following accommodations to return to work:

---

[2] This medication is used to treat anxiety. Lorazepam belongs to benzodiazepines, which act on the brain and nerves (central nervous system) to produce a calming effect.
[3] Duloxetine is used to treat major depressive disorder in adults.

14

Case 1:25-cv-05548-DG-CHK   Document 1-2   Filed 10/02/25   Page 16 of 45 PageID #: 91

    a.  Ability to audio record conversations to aid with his memory retention issues.

    b.  Natural lighting in his workspace, or a "white noise" machine or noise-canceling headphones to aid with his ability to concentrate.

    c.  A set schedule so Mr. Moyle could attend therapy and frequent doctor visits. As well as to balance out the groggy effects of the medication, Mr. Moyle was prescribed.

100.    Upon information and belief, Leo Cummings and Chance Stewart denied Mr. Moyle's accommodation request and failed to provide him with any alternatives.

101.    Leo Cummings and Chance Stewart informed Mr. Moyle that his new job location would be in Upstate New York, and when he returned, he would no longer be a District Manager. As a result, Mr. Moyle was forced to resign 3.5 months into his medical leave.

**PLAINTIFF ROY WELSH**

102.    Plaintiff Welsh has served in the United States Marine Corps and the Israeli Defense Forces. Mr. Welsh has received numerous commendations for his involvement in countless missions beyond the wire. As a Marine and an Israeli soldier, Mr. Welsh followed orders. When superiors at UPS instructed him to work as directed, Mr. Welsh took their words seriously. And like the military, Mr. Welsh trusted them to guide him towards correctly understanding and interpreting UPS methods and procedures.

103.    The Defendants employed Mr. Welsh from approximately June 26, 2016, until July 20, 2019.

104.    Plaintiff Welsh is a former employee of Defendant UPS who was employed as an On-Road-Supervisor and Delivery Driver. With over three (3) years of experience working for UPS, first as a driver and ending as an "On-the-Road Supervisor," Plaintiff Welsh is more than qualified to have worked as an On-Road Supervisor.

105.    Before becoming an "On-the-Road Supervisor," Plaintiff Welsh had previously worked as a UPS delivery driver, satisfying the driving, package delivery, customer needs, GTS and SEAS, and observations experience requirements for the "On-Road-Supervisor" position. Plaintiff Welsh is currently thirty-six (36) years old, meaning he was well over twenty-one (21) years old when he assumed the "On-the-Road Supervisor" position. As a U.S. citizen who resided in NYC at the time of his employment, Plaintiff Welsh satisfied the U.S. citizen and geographic location requirements for an On-Road Supervisor.

106.    Mr. Welsh's work duties required neither discretion nor independent judgment.

15

Case 1:25-cv-05548-DG-CHK    Document 1-2    Filed 10/02/25    Page 17 of 45 PageID #: 92

107.    Mr. Welsh is a whistleblower who raised concerns about document manipulation, fraudulent reporting of accidents, management readiness exam cheating, DOT hours of service regulation violations, massive overtime theft of the drivers and on-road supervisors', and other abuses by UPS management.

108.    As was the case with Mr. Murray, Mr. Welsh raised his concerns with human resources surrounding the discriminatory and retaliatory actions of his supervisor and one of the UPS employees. He also raised concerns about the lack of safety concerning the number of hours On-Road-Supervisors are required to work and the quick turnaround time for them to return to work for meetings or the next shift.

109.    Mr. Welsh sustained substantial psychological and monetary injuries due to the hostile work environment he was subjected to while an employee of UPS by his former manager, Chance Stewart, and UPS senior management.

110.    Mr. Welsh has firsthand knowledge of UPS violating the U.S. Department of Labor and New York State wage and hour laws.

111.    Mr. Welsh is prepared to prove that UPS senior management stole hundreds of hours of overtime from a class of package delivery drivers. The evidence will show that many drivers start work at 7 a.m. or 9 a.m. and punch out at 10 p.m. or 12 a.m. That is an average of fifteen (15) to seventeen (17) hours a day. In a five (5)-day work week, these drivers work an average of sixty (60) to seventy (70) hours weekly. Many of these drivers work six days a week, which brings their hours into the mid-'80s and '90s. Some drivers work seventeen (17) to eighteen (18)-hour shifts; however, the overtime hours were not reflected on the drivers' paychecks.

*Anthony Celano Instructs Staff to Scrub All Discrepancies*

112.    On Friday, November 25, 2016, as Mr. Welsh was closing the building, Anthony Celano instructed Mr. Welsh, along with a fellow On-Road Supervisor, to stay at the office "as long as it takes to scrub out all discrepancies."

113.    Upon information and belief, this means that hundreds, if not thousands, of packages that had not been delivered that day would have scans on them to excuse their service failures. It helps a manager's numbers, which helps a manager's balanced scorecard, directly affecting their pay raise and promotion likelihood.

16

114.    Upon information and belief, Mr. Welsh had no idea what discrepancies were or what it meant to 'scrub' ODSE at the time, but he sat along with Alfonso Macera,[4] and 'scrubbed' ODSE until approximately 2 a.m.

115.    Upon information and belief, the following day, while heading to work, Anthony Celano reached out to Mr. Welsh, asking where the printouts of the scrubbed discrepancies could be found in case he was audited. As Mr. Welsh arrived at work, he gave him the printouts, but Anthony Celano was fuming.

116.    He tossed the stack of documents at Mr. Welsh's feet, saying, "It's too late, you fucking idiot."

117.    Mr. Welsh requested a sit-down with Anthony Celano later that day to clear the air. When they met, Mr. Welsh asked him to criticize him for his performance. In this case, his performance was sub-par in Anthony Celano's eyes because Mr. Welsh had forgotten to place a stack of papers on his desk at 2 a.m. after unknowingly cheating on his behalf.

118.    Mr. Welsh told Anthony Celano he expected to own his successes and failures. Anthony Celano interrupted Mr. Welsh, saying, "I'll tell you whatever the fuck I feel like." He then handed Mr. Welsh his phone and said, "Go ahead. Call the 1-800 number on me. I dare you. It won't be the first time." He then threw Mr. Welsh out of his office; this was Mr. Welsh's first taste of a culture encouraging delivery records' falsification.


### *Hector Fortis Called Mr. Welsh A Faggot*

119.    One of the most distressing moments of Mr. Welsh's employment with UPS came in his dealings with Hector Fortis, a former service provider and current Local 804 Business Agent in the Metro New York Ops Group.

120.    A few months before Mr. Welsh left UPS, he had an interaction with Hector Fortis in which Hector Fortis called Mr. Welsh a "faggot."

121.    Mr. Welsh, a heterosexual male with many LGBTQ members amongst his family, friends, and staff, approached Hector Fortis immediately to clear up the incident and let him know it was unacceptable. Hector became enraged and approached Mr. Welsh in a threatening manner[5].

---

[4] An On-Road-Supervisor was later arrested for stealing off routes and selling them to Bronx pawn shops.

[5] He got in his face, nose to nose.

17

Case 1:25-cv-05548-DG-CHK    Document 1-2    Filed 10/02/25    Page 19 of 45 PageID #: 94

122.   Mr. Welsh told Hector Fortis that it is unacceptable for hourly employees to perceive that their business agent harbors homophobic views. Rather than apologizing, Hector Fortis screamed at Mr. Welsh.

123.   Mr. Welsh filed a complaint with Lloyd Hall, his business manager. Lloyd Hall told him it would blow over, and Hector Fortis's bark was worse than his bite. Mr. Welsh reiterated that his bark was his concern as homophobia is unacceptable to him due to his many relationships with members of the LGBTQ community and the fact that some of the staff identify as gay. He also raised concerns about his physical safety since Hector got into his face in a threatening manner.

124.   Lloyd Hall warned Mr. Welsh against making a "big deal" out of this incident and reminded him that bad things happen to managers and employees who create UPS problems.

125.   Mr. Welsh called the 1-800 number to complain of Hector Fortis's behavior for fear of his safety. Mr. Welsh mentioned on the call that hate crimes are rising in New York City and that hateful language often correlates with such crimes. Mr. Welsh reported this incident to Human Resources as well. He never heard anything else from Defendant Corporation on the matter.

*Mr. Welsh Is Required To Work Unthinkable Hours Without Help*

126.   Mr. Welsh worked Tuesday-Saturday from 6:30 a.m. to 5 p.m. This schedule was in line with his religious practices and would allow Mr. Welsh to be home before sunset.

127.   Upon information and belief, Mr. Welsh's work schedule changed dramatically after reporting Hector Fortis. Mr. Welsh went from working an average of forty (40) to fifty (50) hours a week to working from 7 a.m. until 11 p.m.

128.   During this period, Mr. Welsh was responsible for everything in operation from dispatch until the end of the day. Mr. Welsh performed these duties without the benefit of a secretary and often without a mechanic present.

129.   There were several instances where Mr. Welsh paid a secretary out of his pocket ($50 plus dinner) to have assistance with driver timecards at the end of the day so he could go home at a manageable hour. Upon information and belief, Mr. Welsh was the only On-Road Supervisor who had to pay out of pocket to have a secretary at his location. Mr. Welsh's comparator, Fari Murray, did not have this experience.

Case 1:25-cv-05548-DG-CHK    Document 1-2    Filed 10/02/25    Page 20 of 45 PageID #: 95

130.    Upon information and belief, Mr. Welsh knows that Rhonda Ward was consulted about the Yonkers Center not having a secretary on Saturdays, and no action was taken to correct the problem. There were a few instances where Mr. Welsh received calls from Rhonda Ward and Lloyd Hall after 11:30 p.m. on Saturday, asking questions about the operation results. These calls were responses to Mr. Welsh's earlier phone calls. They purposely called in late to keep Mr. Welsh at work all day.

### *Retaliation For Reporting Hector Fortis Led To Severe Anxiety And Depression*

131.    The constant retaliation caused Mr. Welsh to develop high blood pressure. This led Mr. Welsh to seek medical attention, which resulted in a diagnosis of depression and severe anxiety.

    a.    Mr. Welsh was out on medical leave for two months.

    b.    Mr. Welsh was prescribed Escitalopram[6].

    c.    The side effects of Escitalopram are:

        i.    blurred vision, tunnel vision, eye pain or swelling, or seeing halos around lights;

        ii.    racing thoughts, unusual risk-taking behavior, feelings of extreme happiness or sadness;

        iii.    Low sodium levels in the body include headache, confusion, slurred speech, severe weakness, vomiting, loss of coordination, and feeling unsteady.

132.    Due to the experience of the side effects of Escitalopram, Mr. Welsh informed Lloyd Hall and Justin LaPorte (Lloyd's manager) that he would need reasonable accommodations when he returned to work after his short-term disability leave. Upon information and belief, Mr. Welsh requested the following accommodations:

    a.    A return to the set schedule of 6 a.m.-5 p.m. so he could be home by sundown;

    b.    The ability to work from home two days out of the week so he could attend medical appointments;

    c.    White light in the office to reduce headaches and improve concentration.

    d.    Removal of Hector Fortis from the facility or his work shift.

    e.    The ability to take lunch breaks free of retribution.

---

[6] Escitalopram, sold under the brand names Cipralex and Lexapro, is an antidepressant of the selective serotonin reuptake inhibitor (SSRI) class.  Escitalopram is mainly used to treat a major depressive or generalized anxiety disorder.

19

Case 1:25-cv-05548-DG-CHK    Document 1-2    Filed 10/02/25    Page 21 of 45 PageID #: 96

133.    Upon information and belief, Lloyd Hall denied Mr. Welsh's accommodations request and informed him that he would be transferred to the Parsippany, New Jersey, pre-load location. In light of this apparent act of retaliation and left with no other alternative, Mr. Welsh resigned from the company.

**PLAINTIFF TYLER LILLY**

134.    Plaintiff Lilly is a former employee of Defendant UPS who was employed as an On-Road-Supervisor and Delivery Driver. With over three years of experience working for UPS, first as a package delivery driver, then as an "On-Road-Supervisor." Plaintiff Lilly is more than qualified to have worked as an On-Road-Supervisor for UPS.

135.    The Defendants employed Mr. Lilly from 2019 until 2022.

136.    Mr. Lilly's work duties required neither discretion nor independent judgment.

137.    Mr. Lilly is a whistleblower who raised concerns about document manipulation, fraudulent reporting of accidents, management readiness exam cheating, DOT hours of service regulation violations, massive overtime theft of the driver, and other abuses by UPS management.

138.    As was the case with Mr. Murray, Mr. Welsh, Mr. Steele, and Mr. Moyle, Mr. Lilly raised concerns with human resources surrounding the lack of safety concerning the number of hours On-Road-Supervisors and delivery drivers are required to work, as well as the quick turnaround time for them to return to work for meetings or to work another shift.

139.    Mr. Lilly sustained substantial psychological and monetary injuries due to the hostile work environment he was subjected to while an employee of UPS by his former managers and UPS senior management.

140.    Mr. Lilly knows firsthand about UPS violating the U.S. Department of Labor and New York State wage and hour laws.

141.    Mr. Lilly is prepared to prove that UPS senior management stole hundreds of hours of overtime from a class of drivers and On-Road-Supervisors. The evidence will show that many drivers and On-Road-Supervisors start work from 7 a.m. to 9 a.m. and punch out at 10 p.m. and 12 a.m. That is an average of 15 to 17 hours a day. In a 5-day work week, these drivers and On-Road-Supervisors work an average of 60 to 70 hours weekly. Many of these drivers and On-Road-Supervisors work six days a week, which brings their hours into the mid-'80s and '90s. These hours are not reflected on their paychecks.

20

*Unpaid Overtime: On-Road-Supervisor*

142.    Mr. Lilly was an On-Road-Supervisor (2020-2022). As detailed above, and as evidenced by Mr. Lilly's stellar performance reviews, he was qualified to work as an On-Road-Supervisor. Mr. Lilly typically worked 60-80 hours a week as an On-Road-Supervisor.

143.    Mr. Lilly had no power to hire or fire any of the delivery drivers he monitored.

144.    For Mr. Lilly to change or adjust the schedules or hours of the delivery drivers, he was required to get permission from UPS senior management.

145.    . For Mr. Lilly to grant any request from delivery drivers (sick days, vacation days, etc.), he had to get permission from his manager or UPS senior management.

*Wage Discrimination: On-Road-Supervisor[7]*

146.    In addition to suffering overtime theft, Mr. Lilly (an African-American, Latino, and Spanish-speaking male) was a victim of wage discrimination.

147.    Upon information and belief, Mr. Lilly earned an $80,000.00 base salary as an On-Road-Supervisor, while his Caucasian male counterpart, Patrick Scanlon ("Scanlon"), earned over $100,000.00 base salary.

148.    Upon information and belief, Mr. Lilly was just as qualified as Scanlon for the On-Road-Supervisor's position.

149.    In addition to Scanlon, Mr. Lilly was compensated less than Roy Welsh, Carl Lucateli, Joseph Simeone, and Robert "Bob" Walsh. These individuals were all Caucasian, were all On-Road-Supervisors when Mr. Lilly was employed with UPS (several of them survived Mr. Lilly's tenure at UPS), and all possessed the same skills and knowledge that Mr. Lilly had when he assumed the role of On-Road-Supervisor.

150.    As an On-Road-Supervisor, there is no difference between the job descriptions, duties, or requirements for Scanlon, Roy Welsh, Carl Lucateli, Joseph Simeone, Robert "Bob" Walsh, or Mr. Lilly.

**PLAINTIFF TRAVIS STEELE**

151.    Plaintiff Steele is a former employee of Defendant UPS who was employed as a Business Manager, On-Road-Supervisor, and Delivery Driver. With over seven years of experience working for UPS, first as a package delivery driver, then as an On-Road-Supervisor, and

---

[7] These facts and claims are included to add context of Mr. Lilly's claims. These claims will be addressed in a separate filing in this District due to Defendants opposition to have it included in this case.

Case 1:25-cv-05548-DG-CHK    Document 1-2    Filed 10/02/25    Page 23 of 45 PageID #: 98

ending as a Business Manager. Plaintiff Steele is more than qualified to have worked as a Business Manager for UPS.

152.     The Defendants employed Mr. Steele from 2014 until 2021.

153.     Mr. Steele's work duties required neither discretion nor independent judgment.

154.     Mr. Steele is a whistleblower who raised concerns about document manipulation, fraudulent reporting of accidents, management readiness exam cheating, DOT hours of service regulation violations, massive overtime theft of the driver, and other abuses by UPS management.

155.     Mr. Steele sustained substantial psychological and monetary injuries due to the hostile work environment he was subjected to while an employee of UPS by his former managers and UPS senior management.

156.     Mr. Steele knows firsthand about UPS violating the U.S. Department of Labor and New York State wage and hour laws.

157.     Mr. Steele is prepared to prove that UPS senior management stole hundreds of hours of overtime from a class of drivers and On-Road-Supervisors. The evidence will show that many drivers and On-Road-Supervisors start work from 7 a.m. to 9 a.m. and punch out at 10 p.m. and 12 a.m. That is an average of fifteen (15) to seventeen (17) hours a day. In a five (5) day work week, these drivers and On-Road-Supervisors work an average of sixty (60) to seventy (70) hours weekly. Many of these drivers and On-Road-Supervisors work six days a week, which brings their hours into the mid-'80s and '90s. These hours are not reflected on their paychecks.

158.     Mr. Steele has evidence of some drivers and On-Road-Supervisors working seventeen (17) to eighteen (18) hour shifts. These hours were not reflected on the driver's or On-Road-Supervisors' paychecks.

///

///

///

///

///

///

///

22

*Unpaid Overtime: On-Road-Supervisor[8]*

159.    Mr. Steele was an On-Road-Supervisor (2015-2018). As detailed above, and as evidenced by Mr. Steeles' stellar performance reviews, he was qualified to work as an On-Road-Supervisor. Mr. Steele typically worked 60-80 hours a week as an On-Road-Supervisor.

160.    Mr. Steele had no power to hire or fire any of the delivery drivers he monitored. For Mr. Steele to change or adjust the schedules or hours of the delivery drivers, he was required to get permission from UPS senior management.

161.    For Mr. Steele to grant any request from delivery drivers (sick days, vacation days, etc.), he had to get permission from his manager or UPS senior management.

## THE WAGE AND HOUR PLAINTIFF'S

162.    Plaintiffs Palaguachi, Santiago, Radwan, and Payne are former employees of Defendants who were employed as delivery drivers.

163.    According to UPS's Jobsite, the job description for Delivery Drivers is as follows:

> "This is a physical, fast-paced, outdoor position that involves continual lifting, lowering, and carrying packages that typically weigh 25 - 35 lbs. and may weigh up to 70 lbs.  A DOT physical exam is required.  Package Delivery Drivers must have excellent customer contact and driving skills.  Some UPS facilities may require the ability to drive a delivery vehicle with a standard (manual) transmission. Qualified applicants must have a valid driver's license issued in the state where they live.  Package Delivery Drivers are expected to comply with UPS appearance guidelines and wear the company-provided uniform."

164.    Plaintiffs Payne, Santiago, Radwan, and Palaguachi were more than qualified to work as package delivery drivers and performed their job duties as required.

165.    Plaintiffs Palaguachi, Santiago, Radwan, Lilly, Steele, Moyle, Welch, and Payne seek to represent a class of similarly situated individuals under N.Y. CLS CPLR § 901.

## PLAINTIFF CARLOS PALAGUACHI

166.    Plaintiff Palaguachi's work duties required neither discretion nor independent judgment.

167.    Plaintiff Palaguachi regularly worked more than forty (40) hours per week throughout his employment with Defendants.

---

[8] As is the case with Mr. Lilly above, these facts and claims are included to add context of Mr. Steele's claims.  These claims will be addressed in a separate filing in this District due to Defendants opposition to have it included in this case.

23

168.  From approximately October 2017 until May 2018, Plaintiff Palaguachi worked as a package delivery driver from approximately 8:00 a.m. until about 11:00 p.m., Sunday through Friday, typically fifty (50) to eighty (80) hours per week.

169.  Defendants paid Plaintiff Palaguachi his wages through check or direct deposit throughout his employment.

170.  Plaintiff Palaguachi's pay did not vary even when he was required to start earlier or work a more extended day than his usual schedule. For example, Defendant UPS required Plaintiff Palaguachi to start work hours earlier or work long days when there was a staff shortage and did not pay him overtime for the additional time he worked.

171.  Plaintiff Palaguachi kept track of his hours because it is reflected on his pay stubs under the "hours" column. Defendant UPS utilizes a time-tracking device, such as punch cards.

172.  Notifications such as posted notices and written correspondences were not given to Plaintiff Palaguachi regarding overtime and wages under the NYLL.

173.  Upon information and belief, Defendant UPS did not provide Plaintiff Palaguachi an accurate statement of wages, as required by NYLL 195(3).

174.  Upon information and belief, Plaintiff Palaguachi is prepared to prove that William Grey and UPS Senior management instructed him to hide numerous automobile accidents.

175.  Upon information and belief, Plaintiff Palaguachi is prepared to prove that the defendants instructed him to lie about delivery records like missed packages and falsely manipulate delivery attempts. The scheme Mr. Palaguachi was required to employ is as follows: he was instructed to go close to the customer's home, scan the package, and place the package in the truck even if Mr. Palaguachi never made the delivery attempt.

176.  Plaintiff Palaguachi was required to deliver packages with his vehicle while not being compensated for the mileage or gas he used.

177.  Defendants required Plaintiff Palaguachi to deliver packages out of his vehicle during the holiday season, such as Thanksgiving, Easter, and Christmas.

## PLAINTIFF WARREN PAYNE

178.  Plaintiff Payne's work duties required neither discretion nor independent judgment.

179.  Plaintiff Payne regularly worked more than forty (40) hours per week throughout his employment with Defendant UPS.

180.    From approximately August 2017 until June 2018, Plaintiff Payne worked as a package delivery driver from approximately 8:00 a.m. until about 11:00 p.m., Sunday through Friday, typically 50 to 80 hours per week.

181.    Defendants paid Plaintiff Payne his wages through check or direct deposit throughout his employment.

182.    Plaintiff Payne's pay did not vary even when he was required to start earlier or work a more extended day than his usual schedule. For example, Defendants required Plaintiff Payne to start work hours earlier or work long days when there was a staff shortage and did not pay him overtime for the additional time he worked.

183.    Plaintiff Payne kept track of his hours because it is reflected on his pay stubs under the "hours" column. Defendants utilize a time-tracking device, such as punch cards.

184.    Notifications in the form of posted notices and written correspondences were not given to Plaintiff Payne regarding overtime and wages under the NYLL.

185.    Upon information and belief, Defendants did not provide Plaintiff Payne an accurate statement of wages, as required by NYLL 195(3).

186.    Upon information and belief, Plaintiff Payne is prepared to prove that Defendants instructed him to hide numerous automobile accidents.

187.    Plaintiff Payne is prepared to prove that Defendants instructed him to lie about delivery records like missed packages and falsely manipulating delivery attempts. The scheme Plaintiff Payne was required to employ is as follows: he was instructed to go close to the customer's home, scan the package, and place the package in the truck even if Plaintiff Payne never attempted delivery.

188.    Plaintiff Payne was required to deliver packages with his vehicle while not compensated for the mileage or gas he used.

189.    Defendants required Plaintiff Payne to deliver packages from his vehicle during the holiday season, such as Thanksgiving, Easter, and Christmas.

## **PLAINTIFF ROBERT SANTIAGO**

190.    Plaintiff Santiago's work duties required neither discretion nor independent judgment.

191.    Plaintiff Santiago regularly worked more than forty (40) hours per week throughout his employment with Defendant UPS.

25

Case 1:25-cv-05548-DG-CHK    Document 1-2    Filed 10/02/25    Page 27 of 45 PageID #: 102

192.    From approximately April 7, 2014, until October 18, 2020, Plaintiff Santiago worked as a package delivery driver from approximately 8:00 a.m. until 11:00 p.m., Sunday through Friday, typically fifty (50) to eighty (80) hours per week.

193.    Defendants paid Plaintiff Santiago his wages through check or direct deposit throughout his employment.

194.    Plaintiff Santiago's pay did not vary even when he was required to start earlier or work a more extended day than his usual schedule. For example, Defendants required Plaintiff Santiago to start work hours earlier or work long days when there was a staff shortage and did not pay him overtime for the additional time he worked.

195.    Plaintiff Santiago kept track of his hours because it is reflected on his pay stubs under the "hours" column. Defendants utilized a time-tracking device, such as punch cards.

196.    Posted notices and written correspondences were not given to Plaintiff Santiago regarding overtime and wages under the NYLL.

197.    Upon information and belief, Defendants did not provide Plaintiff Santiago with an accurate statement of wages, as required by NYLL 195(3).

198.    Upon information and belief, Plaintiff Santiago is prepared to prove that Defendants instructed him to hide numerous automobile accidents.

199.    Plaintiff Santiago is prepared to prove that Defendants instructed him to lie about delivery records like missed packages and falsely manipulating delivery attempts. The scheme Plaintiff Santiago was required to employ is as follows: he was instructed to go close to the customer's home, scan the package, and place the package in the truck even if he never made the delivery attempt.

200.    Plaintiff Santiago was required to deliver packages with his vehicle while not compensated for the mileage or gas he used.

201.    Defendants required Plaintiff Santiago to deliver packages from his vehicle during the holiday season, such as Thanksgiving, Easter, and Christmas.

### PLAINTIFF AHMED RADWAN

202.    Plaintiff Radwan's work duties required neither discretion nor independent judgment.

203.    Plaintiff Radwan regularly worked more than forty (40) hours per week throughout his employment with Defendant UPS.

26

Case 1:25-cv-05548-DG-CHK    Document 1-2    Filed 10/02/25    Page 28 of 45 PageID #:
103

204.   From approximately July 2018 until October 1, 2018, Plaintiff Radwan worked as a package delivery driver from approximately 8:00 a.m. until about 11:00 p.m., Sunday through Friday, typically fifty (50) to ninety (90) hours per week.

205.   Defendants paid Plaintiff Radwan his wages through check or direct deposit throughout his employment.

206.   Plaintiff Radwan's pay did not vary even when he was required to start earlier or work a more extended day than his usual schedule. For example, Defendants required Plaintiff Radwan to start work hours earlier or work long days when there was a staff shortage and did not pay him overtime for the additional time he worked.

207.   Plaintiff Radwan kept track of his hours because it is reflected on his pay stubs under the "hours" column. Defendants utilized a time-tracking device, such as punch cards.

208.   Upon information and belief, notifications in the form of posted notices and written correspondences were not given to Plaintiff Radwan regarding overtime and wages under the NYLL.

209.   Upon information and belief, Defendants did not provide Plaintiff Radwan an accurate statement of wages, as required by NYLL 195(3).

210.   Upon information and belief, Plaintiff Radwan is prepared to prove that Defendants instructed him to hide numerous automobile accidents.

211.   Plaintiff Radwan is prepared to prove that Defendants instructed him to lie about delivery records like missed packages and falsely manipulating delivery attempts. The scheme Plaintiff Radwan was required to employ is as follows: he was instructed to go close to the customer's home, scan the package, and place the package in the truck even if Plaintiff Radwan never made the delivery attempt.

212.   Plaintiff Radwan was required to deliver packages with his vehicle while not compensated for the mileage or gas he used.

213.   Defendants required Plaintiff Radwan to deliver packages out of his vehicle during the holiday season, such as Thanksgiving, Easter, and Christmas.

///
///
///
///
///
///

27

**FIRST CAUSE OF ACTION**
New York Labor Law CLAIM
**(On behalf of Plaintiff Palaguachi, Plaintiff Santiago, Plaintiff Radwan, Plaintiff Lilly, Plaintiff Steele, Plaintiff Moyle, Plaintiff Welch, and Plaintiff Payne, and all similarly situated employees)**

214.    Plaintiff Palaguachi, Plaintiff Santiago, Plaintiff Radwan, Plaintiff Lilly, Plaintiff Steele, Plaintiff Moyle, Plaintiff Welch, and Plaintiff Payne, and all similarly situated employees repeat and reallege all paragraphs above as though fully set forth herein.

215.    CPLR § 901(a) provides the prerequisites for a class action. They are: a. One or more members of a class may sue or be sued as representative parties on behalf of all if:

   a.    The Class is so numerous that the joinder of all members, whether otherwise required or permitted, is impracticable;

   b.    There are questions of law or fact common to the Class that predominate over any questions affecting only individual members;

   c.    The claims or defenses of the representative parties are typical of the claims or defenses of the Class;

   d.    The representative parties will fairly and adequately protect the interests of the Class and

   e.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

216.    " Whether a particular lawsuit qualifies as a class action rests within the sound discretion of the trial court. In exercising this discretion, a court must be mindful of our holding that the class certification statute should be liberally construed." (*Kudinov v. Kel-Tech Constr. Inc.* 65 AD3d 481, 884 N.Y.S.2d 413 [1st Dept 2009] citing *Englade v. Harper Collins Publrs., Inc.*, 289 AD2d 159, 734 N.Y.S.2d 176 [2002]).

217.    The movant has the burden of establishing the prerequisites in CPLR 901(a), *Kudinov supra*. "Any error, if there is to be one, should be ... in favor of allowing the class action." (*Esplin v. Hirschi*, 402 F2d 94 [1968]).

*Numerosity*

218.    CPLR §901(a)(1) requires that the Class be so numerous that the joinder of all class members is impracticable.

219.    There is no 'mechanical test' to determine whether ... numerosity has been met, nor is there a set rule for the number of prospective class members which must exist before a class is

28

Case 1:25-cv-05548-DG-CHK Document 1-2 Filed 10/02/25 Page 30 of 45 PageID #: 105

certified ... each case depends upon the particular circumstances surrounding the proposed Class and the Court should consider the reasonable inferences and common-sense assumptions from the facts before it. *Friar v. Vanguard Holding Corp.*, 78 AD2d 83, 434 N.Y.S.2d 698 (2nd Dept 1980).

220.   Here, the Plaintiffs assert that the Defendants operate multiple package delivery facilities throughout New York.

221.   According to Defendant UPS's website, it operates Package Delivery Facilities in the following cities:





Home > Locations > New York

**UPS Locations in New York**

| | | | | | |
|---|---|---|---|---|---|
| Addison | Clifton Springs | Goshen | Lyons | Peekskill | Springville |
| Afton | Clinton | Gouverneur | Macedon | Pelham | Stamford |
| Albany | Cobleskill | Gowanda | Mahopac | Penn Yan | Staten Island |
| Albertson | Cohoes | Grand Island | Malone | Perry | Stony Brook |
| Albion | Cold Spring | Granville | Mamaroneck | Phelps | Strykersville |
| Alden | College Point | Greenlawn | Manhasset | Pine Bush | Suffern |
| Alexandria Bay | Commack | Greenville | Manlius | Pine Plains | Sunnyside |
| Allegany | Constantia | Greenwich | Marcellus | Plainview | Syosset |
| Amenia | Coram | Greenwood Lake | Margaretville | Plattsburgh | Syracuse |
| Amityville | Corning | Hamburg | Marlboro | Pleasant Valley | Tappan |

29

| | | | | | |
|---|---|---|---|---|---|
| Amsterdam | Corona | Hamilton | Maspeth | Pleasantville | Tarrytown |
| Angola | Cortland | Hampton Bays | Massapequa | Port Chester | Thornwood |
| Arcade | Cortlandt Manor | Hancock | Massena | Port Jefferson | Ticonderoga |
| Armonk | Cutchogue | Hannibal | Mattituck | Port Jefferson Station | Tonawanda |
| Arverne | Dansville | Harrison | Mechanicville | Port Jervis | Troy |
| Astoria | Deer Park | Harrisville | Medford | Port Washington | Uniondale |
| Attica | Delmar | Hastings On Hudson | Medina | Potsdam | Utica |
| Au Sable Forks | Depew | Hempstead | Merrick | Poughkeepsie | Vails Gate |
| Auburn | Dover Plains | Henrietta | Mexico | Prattsburgh | Valatie |
| Avon | Dunkirk | Herkimer | Middle Village | Prattsville | Valley Cottage |
| Ballston Spa | East Amherst | Hewlett | Middleburgh | Pulaski | Valley Stream |
| Batavia | East Aurora | Hicksville | Middletown | Queens Village | Vestal |
| Bath | East Concord | Highland Falls | Millerton | Queensbury | Victor |
| Bay Shore | East Elmhurst | Hilton | Mineola | Ravena | Waddington |
| Bayport | East Greenbush | Holbrook | Mohegan Lake | Red Hook | Wading River |
| Bayside | East Hampton | Hollis | Monroe | Rego Park | Wallkill |
| Bayville | East Islip | Honeoye | Montgomery | Rensselaer | Walton |
| Beacon | East Moriches | Honeoye Falls | Monticello | Rhinebeck | Wantagh |
| Bellerose | East Northport | Hoosick Falls | Morrisville | Richmond Hill | Wappingers Falls |
| Bellport | East Rockaway | Hopewell Junction | Mount Kisco | Ridgewood | Warrensburg |
| Binghamton | East Setauket | Hornell | Mount Vernon | Riverhead | Warsaw |
| Bohemia | East Syracuse | Horseheads | Nanuet | Rochester | Warwick |
| Boonville | Eastchester | Howard Beach | Naples | Rock Hill | Waterloo |
| Breezy Point | Elbridge | Hudson | Narrowsburg | Rockaway Beach | Watertown |
| Brentwood | Elmhurst | Hudson Falls | New Hartford | Rockaway Park | Waterville |
| Brewster | Elmira | Huntington | New Hyde Park | Rockville Centre | Watervliet |
| Bridgehampton | Elmont | Huntington Station | New Paltz | Rocky Point | Watkins Glen |
| Brockport | Elmsford | Hyde Park | New Rochelle | Rome | Wayland |
| Bronx | Endicott | Ilion | New York | Ronkonkoma | Webster |
| Bronxville | Endwell | Island Park | Newark | Roosevelt | Wellsville |
| Brooklyn | Fairport | Ithaca | Newburgh | Roslyn Heights | West Haverstraw |
| Buffalo | Falconer | Jackson Heights | Niagara Falls | Rouses Point | West Hempstead |
| Burnt Hills | Far Rockaway | Jamaica | North Babylon | Saint Albans | West Nyack |
| Cairo | Farmingdale | Jamestown | North Baldwin | Sanborn | West Sayville |
| Cambria Heights | Farmington | Johnson City | North Bellmore | Saranac Lake | West Seneca |
| Camden | Farmingville | Johnstown | North Tonawanda | Saratoga Springs | Westbury |
| Camillus | Ferndale | Kew Gardens | Northport | Saugerties | Westfield |
| Canandaigua | Floral Park | Kings Park | Northville | Savannah | Westhampton Beach |
| Canastota | Flushing | Kingston | Norwich | Scarsdale | White Plains |
| Canton | Forest Hills | Lake Luzerne | Oakland Gardens | Schenectady | Whitehall |
| Carmel | Franklinville | Lakewood | Oceanside | Seaford | Whitestone |
| Carthage | Freeport | Larchmont | Ogdensburg | Shelter Island Heights | Williamson |
| Catskill | Fresh Meadows | Latham | Olean | Shirley | Williston Park |
| Cedarhurst | Fulton | Lawrence | Oneida | Sidney | Windham |
| Center Moriches | Gansevoort | Levittown | Oneonta | Skaneateles | Woodhaven |
| Centereach | Garnerville | Lewiston | Ontario | Smithtown | Woodmere |
| Central Square | Geneseo | Liberty | Orchard Park | Sodus | Woodside |
| Central Valley | Geneva | Lindenhurst | Ossining | South Glens Falls | Woodstock |
| Chatham | Getzville | Little Neck | Oswego | South Hempstead | Wy Ntskill |
| Chester | Glen Cove | Liverpool | Oyster Bay | South Ozone Park | Yonkers |
| Chittenango | Glen Head | Lockport | Ozone Park | South Richmond Hill | Yorktown |
| Cicero | Glendale | Long Beach | Palmyra | South Salem | Yorktown Heights |
| Cincinnatus | Glenfield | Long Island City | Patchogue | Speculator | Yorkville |
| Clay | Glenmont | Lowville | Pawling | Spring Valley | |
| Clifton Park | Gloversville | Lynbrook | Pearl River | Springfield Gardens | |

30

222.    Upon information and belief, the facilities mentioned above employ over five hundred package driver drivers each. Estimating that there are potentially over ten thousand (10,000) impacted drivers.

223.    Plaintiffs submit over twenty (20) text messages to support their allegations that delivery drivers had their overtime hours stolen by Defendants. Each text message affirms that the Defendants engaged in alleged violations of the NYLL.

224.    Below is a list of text messages from drivers requesting payment for stolen overtime and straight time sent to former UPS Employee and On-Road-Supervisor Fari Murray:

    a.  On or about August 17, 2017, at 9:05 a.m., a driver named Blackmon sent Mr. Murray text messages with a screenshot of the time that was reduced from his timecard. His timecard reflected that he worked over 70 hours weekly, yet William Grey went into the GTS and reduced his hours to 57:13.

    b.  On or about November 7, 2017, at 7:18 p.m., Driver Li sent Mr. Murray a text message stating: Are u able to fix my time from Saturday? I started at 9 and left at 8:21 p.m."

    c.  On or about December 11, 2017, at 7:11 p.m., a driver named Creed sent Mr. Murray a text message stating the following: "Was Thursday 8th 7:00 to 21:47". Creed followed up 2 days later, on December 13, 2017, at 11:31 a.m., stating the following: "Let me know if u can fix me hrs if not, I'll go to willi (referring to William Grey).

    d.  On or about May 3, 2018, and May 4, 2018, at 7:44 p.m. and 1:35 p.m., Driver Scott sent Mr. Murray a text message stating, "please fix my time" and "please fix my hrs, dude."

    e.  On or about May 5, 2018, at 3:59 p.m., Driver Qualis Townsend sent Mr. Murray the following text message: "can you fix my hours in from yesterday" and at 4:01 p.m., "smh they didn't put my hours in from the road yesterday."

    f.  On or about November 10, 2017, at 7:15 p.m., Driver Pritchard sent Mr. Murray the following text message: "Good morning, Fari. This is Pritchard. Listen, Tuesday the 7th is still in unresolved. It is showing as a scheduled day off. Please help me. Thank you." This driver worked on this day, and his whole timecard was deleted and set up as if he had the day scheduled off not to work.

    g.  On or about October 27, 2017, and November 9, 2017, at 8:50 a.m. and 8:35 a.m., Driver Harris Solomon sent the following text messages to Mr. Murray: "10-25 (Wednesday) Im missing 2 hours I worked from 9:00 a.m.-8:30 p.m." and "Wednesday 9:00–6:15 p.m., checked timecard its 6 hours……pls correct."

    h.  On or about August 24, 2018, Mr. Murray received a text message from Oleg Gezner concerning his hours worked and missing overtime. The message said: "Mon, Aug 20/18 8:20 a.m. -10:40 p.m.; Tue, Aug 21/18 8:40 a.m. – 11:13 p.m., Wed, Aug 22/18 8:40 a.m. – 11:34 p.m.; and Thu, Aug 23/18 8:40 a.m.-9:29 p.m. In 4 days, this driver worked nearly 54 hours. This driver was only paid for 40 hours.

        i.  A day later, the driver sent a follow-up message to Mr. Murray, "and take a look at my timecard before it is to late." "Don't forget to change my timecard when u get a chance."

31

INDEX NO. 503187/2024
RECEIVED NYSCEF: 01/31/2024

i. On or about September 26, 2018, at 3:36 p.m., Mr. Murray received a text message from Driver Jackson: "Fix my timecard from yesterday 8:40-730 p.m." This was never fixed.

j. On or about August 22, 2018, at 12:02 p.m., Creed sent Mr. Murray a text stating, "Don't forget to put in the ½ hr u owe me." Creed followed up on August 24, 2018, at 8:34 p.m., stating, "Did u put that ½ hr u owe me."

k. On or about September 28, 2017, at 9:43 p.m., Mr. Murray received the following text message from Driver Rose Sheldon: "Farah please don't forget to put my hours in 9 a.m. 2027 thx".

l. On or about May 7, 2018, at 8:48 a.m., Mr. Murray received the following text message from a UPS driver: "Did u take care of the hr u owe me for last week"

m. On or about February 19, 2018, at 12:30 p.m., Mr. Murray received the following text message from UPS driver Creed: "I need u to change my timecard for last Thursday I started at 7:00 someone change it to 7:50". At 8:00 p.m., Creed followed up: "Today is the last day to correct it, so it comes on this week check."

n. On or about January 18, 2018, at 1:14 p.m., Mr. Murray received the following text message from Creed: "Did u put in my missing hrs?" Four days later, on January 19, 2018, at 11:19 a.m., Creed followed up: "Don't forget me with some help." Mr. Murray responded, "Can only add 1 hour". Creed replied, "so add 1 hour a week then."

o. On or about October 23, 2017, at 10:19 a.m., Mr. Murray received the following text message from UPS driver Clarke Anthony: "I got paid time only for 2 days, and I finished my assignment on both days I didn't take lunch those days I spoke to Willie."

p. On or about July 21, 2018, at 8:37 p.m., Mr. Murray received the following text message from UPS driver Cece: "Hey.. This dumb chick never put in my hour the last few times I worked I've been looking for her, but she don't be in.." At 8:38 p.m., Cece followed up with the following: "The way she talking to me right now, I'm about to come there and drag her Fari." Mr. Murray responded, "I'll take care if it when did u finish." Cece responded, "After 7:30, I think ask Lara" "thanks, you're the best."

q. On or about May 2, 2018, at 7:08 p.m., Mr. Murray received the following text message from UPS driver Calix: "You never put that time in for me, boss."

r. On or about July 27, 2018, at 11:06 a.m., Mr. Murray received a text message from Driver McKenzie: "Plz remember to put the 1:15mins back for me"

s. On or about May 16, 2018, at 3:29 p.m., Mr. Murray received the following text message from Driver Mchchearan: "Remember to fix my time."

t. On or about April 4, 2017, at 10:18 a.m., Mr. Murray received a text message from Driver Lara: "Yo don't forget about my 3 hours."

u. On or about September 11, 2017, at 10:02 a.m., Mr. Murray received a text message from Driver Emile: "Please don't forget my time card. Mon: holiday pay, Tues: 8:10-8:12, Wed: 8:40-8:36, Thurs: 8:40-10:44, Fri: oph 8hrs."

v. On or about September 20, 2018, at 2:03 p.m., Mr. Murray received a text message from Eli Fernandez: "Kara said she doesn't see the hours on her check for the last 2 days as helping."

w. On or about May 14, 2018, at 7:26 p.m., Mr. Murray received a text message from Driver Darling: "the adjustment is 41 minutes or .68 clicks from Monday last week thank you."

32

Case 1:25-cv-05548-DG-CHK    Document 1-2    Filed 10/02/25    Page 34 of 45 PageID #:
109

225.    " The threshold for the impracticability of joinder seems to be around forty" (*Galdamez v. Biordi Constr. Corp.*, 13 Misc. 3d 1224[A], 831 N.Y.S.2d 347, 2006 NY Slip Op 51969[U] [2006], aff'd 50 A.D.3d 357, 855 N.Y.S.2d 104 [1st Dept 2008], citing *Dornberger v. Metropolitan Life Ins. Co*., 182 FRD 72, 77 (SD N.Y.1999; see also *Klakis v. Nationwide Leisure Corp*., 73 A.D.2d 521, 522, 422 N.Y.S.2d 407 [1st Dept 1979]). In *Galsamez*, the Plaintiff's affidavits estimated the Class consisted of between 30 and 70 workers, and in the affidavits, other members of the proposed Class were able to recall the names of between (14) fourteen and (22) of them. The Appellate Division affirmed the lower Court's finding that the Plaintiff sufficiently established that the Class was so numerous that the joinder of all members was impracticable (*Galdamez v. Biordi Constr. Corp*, 50 AD3d 357, 855 N.Y.S.2d 104 [1st Dept 2008]).

226.    Here, the Defendants cannot deny that they employ over one hundred (100) package delivery drivers in over twenty (20) locations throughout the state of New York, as Plaintiffs allege that they worked in at least (4) four of those locations, working alongside over 100 individuals each during their employment.

227.    Therefore, the numerosity requirement has been met.

<u>*Commonality*</u>

228.    CPLR §901(a)(2) requires there are questions of law or fact common to the Class, which predominates over any questions affecting only individual members.

229.    " Commonality is not merely an inquiry into whether common issues outnumber individual issues but rather whether the use of a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated." (*Pludeman v. Northern Leasing Sys., Inc*, 74 AD3d 420, 904 N.Y.S.2d 372 [1st Dept 2010], citing *Friar, supra*). Class certification is appropriate even when there are questions of law or fact not common to the Class (*Pludemon, supra,* citing *Freeman v. Great Lakes Energy Partners, LLC*, 12 AD3d 1170, 1171, 785 N.Y.S.2d 640 [2004]).

230.    In this action, Plaintiffs on behalf of the Class and all similarly situated employees identify four (4) essential questions of law and fact common to all members of the putative Class:

    a.    Whether Defendants paid Plaintiffs and putative Class Members all earned wages, including overtime at one-and-one-half times their regular rate for all hours worked over forty (40) per week, due to Defendants' policy of time shaving; and

33

    b.    Whether Defendants properly compensated Plaintiffs and Class Members with all earned wages, including overtime compensation at one-and-one-half times their regular rate for all hours worked over forty (40) per week, due to Defendants' policy of impermissible rounding down of hours; and

    c.    Whether Defendants properly paid Plaintiffs and Class Members with all spread of hours premium earned for workdays exceeding ten (10) hours;

    d.    Whether Defendants properly provided Plaintiffs and Class Members with proper wage statements as required by NYLL § 195; and

231.    Plaintiffs assert that their claims and those of the Class Members arise from a common wrong: the Defendants alleged policy of (i) failing to compensate employees for all their hours worked due to a policy of time-shaving; (ii) failing to compensate employees for all hours worked due to an impermissible policy of rounding, (iii) failing to properly provide proper wage statements, and (iv) failing to pay the spread of hours premium for workdays exceeding ten (10) hours.

232.    In determining whether an action should proceed as a class action, it is appropriate to consider whether the claims have merit (*Bloom v Cunard Line*, 76 AD2d 237, 240, 430 N.Y.S.2d 607 [1980]). However, this "inquiry is limited" (id.), and such threshold determination is not intended to be a substitute for summary judgment or trial (*Kudinov v Kel-Tech Constr. Inc.*, 65 AD3d 481,482, 884 N.Y.S.2d 413 [2009]). Class action certification is thus appropriate if, on the surface, there appears to be a cause of action that is not a sham (*Brandon v Chefetz*, 106 AD2d 162, 168, 485 N.Y.S.2d 55 [1985]). *Pludeman, supra*.

233.    Here, the Plaintiffs have established common questions of law and fact that predominate over any questions affecting only individual members as to the alleged issues of time shaving, rounding down, wage statement violations, and spread of hours premium.

234.    The commonality is met when an employer "failed to pay the required prevailing wage and supplemental benefits owed to" their employees (*Stecko v RLIIns. Co*., 121 AD3d 542, 543, 995 N.Y.S.2d 13 [1st Dept 2014] ["different trades are paid on a different wage scale and thus have different levels of damages does not defeat certification"]; see *Weinstein v Jenny Craig Operations, Inc*., 138 AD3d 546, 547, 30 N.Y.S.3d 618 [1st Dept 2016] ["commonality of the claims will be found to predominate, even though the putative class members have different levels of damages"] [internal quotations omitted]; *Friar v Vanguard Holding Corp*., 78 AD2d

Case 1:25-cv-05548-DG-CHK    Document 1-2    Filed 10/02/25    Page 36 of 45 PageID #: 111

83, 98, 434 N.Y.S.2d 698 [2d Dept 1980] [predominance is not identity or unanimity among class members, "[similarly, the fact that questions peculiar to each individual may remain after resolution of the common questions is not fatal to the class action"]). (*Lavrenyuk v. Life Care Servs.* 2021 NY Misc Lexis 6027, aff'm 198 A.D.3d 569, 152 N.Y.S.3d 907).

235.    Therefore, the Plaintiff's element of commonality has been met.

<u>*Typicality*</u>

236.    CPLR §901(a)(3) requires the claims or defenses of the representative parties to be typical of the claims or defenses of the Class.

237.    If it is shown that a plaintiff's claims derive "from the same practice or course of conduct that gave rise to the remaining claims of other class members and is based upon the same legal theory ... [the typicality] requirement is satisfied" (*Friar* at 99,434 N.Y.S.2d 698; *see also Ackerman* at 201, 683 N.Y.S.2d 179; *Freeman* at 1171, 785 N.Y.S.2d 640). Typicality does not require the identity of issues, and the typicality requirement is met even if the claims asserted by class members differ from those asserted by other class members (*Pruitt v. Rockefeller Cetr. Props*., 167 A.D.2d 14, 22, 574 N.Y.S.2d 672 [1991]; S*uper Glue Corp. v. Avis Rent A Car Sys., Inc*., 132 A.D.2d 604, 607, 517 N.Y.S.2d 764 [1987]). *Pludeman, supra*.

238.    Here, the Plaintiffs have demonstrated through numerous text messages and examples throughout this pleading that the Plaintiff's claims are typical of the proposed Class, as the unlawful policy and practice as alleged by the Plaintiffs are the same or similar to that of the 20 + victims (as evidence by the text messages asserted herein) who would be members of the purported Class.

239.    Therefore, the element of typicality has been met.

<u>*Adequacy*</u>

240.    CPLR §901(a)(4) requires the representative parties to fairly and adequately protect the interests of the Class.

241.    If it is shown that a plaintiff's claims derive "from the same practice or course of conduct that gave rise to the remaining claims of other class members and is based upon the same legal theory ... [the typicality] requirement is satisfied" (*Friar* at 99, 434 N.Y.S.2d 698; see also *Ackerman* at 201, 683 N.Y.S.2d 179; *Freeman* at 1171, 785 N.Y.S.2d 640). Typicality does not require identity of issues, and the typicality requirement is met even if the claims asserted by class members differ from those asserted by other class members (*Pruitt v. Rockefeller Cetr.*

35

Case 1:25-cv-05548-DG-CHK    Document 1-2    Filed 10/02/25    Page 37 of 45 PageID #: 112

*Props.*, 167 A.D.2d 14, 22, 574 N.Y.S.2d 672 [1991]; *Super Glue Corp. v. Avis Rent A Car Sys., Inc.*, 132 A.D.2d 604, 607, 517 N.Y.S.2d 764 [1987]). *Pludeman, supra*.

242.    Here, the Plaintiffs have established that they can fairly and adequately protect the interests of the Class, as they are seeking the same relief as the Class Members, specifically the recovery of wages and damages suffered as a result of the Defendant's alleged unlawful policy and practice of time shaving, rounding down, wage statement violations, and spread of hours premium.

243.    Plaintiffs have further established that they are represented by counsel that are qualified and experienced in handling class action litigation and can provide a catalog of prior cases, similar in nature to the instant action, that their counsels have litigated.

244.    Therefore, the element of adequacy has been met.

245.    CPLR §901(a)(5) requires a class action that is superior to other available methods for the fair and efficient adjudication of the controversy. A class action is the "superior vehicle" for resolving wage disputes "since the damages allegedly suffered by an individual class member are likely to be insignificant, and the costs of prosecuting individual actions would result in the class members having no realistic day in court" (*Nawrocki*, 82 A.D.3d at 536; *see also Dabrowski*, 84 AD3d at 635). (*Stecko v RLI Inc. Co*, 121 AD3d 542, 995 N.Y.S.2d 13 [2014]).

246.    Plaintiffs have established that the controversy at issue involves wage disputes; therefore, the fifth element of CPLR § 901 (a) is established.

247.    If the prerequisites of CPLR § 901(a) have been met, the Court must then consider the five factors provided in CPLR § 902.

248.    Among the matters which the Court shall consider in determining whether the action may proceed as a class action are:

a.    The interest of members of the Class in individually controlling the prosecution or defense of separate actions;

b.    The impracticability or inefficiency of prosecuting or defending separate actions;

c.    The extent and nature of any litigation concerning the controversy already commenced by or against members of the Class;

d.    The desirability or undesirability of concentrating the litigation of the claim in the particular forum;

e.    The difficulties are likely to be encountered in the management of a class action.

36

Case 1:25-cv-05548-DG-CHK    Document 1-2    Filed 10/02/25    Page 38 of 45 PageID #: 113

249.   The elements required under CPLR §§ 902(1), (2), (4), and (5) have been satisfied and discussed above as part of the commonality, typicality, and superiority requirements under CPLR §901(a). Regarding CPLR § 902(3), the Plaintiff asserts there is no extensive, competing litigation already commenced by any member of the Class.

250.   Based on the foregoing, the motion to certify the Class must granted.

251.   Plaintiffs, the Class, and all similarly situated employees are damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### VIOLATION OF THE OVERTIME PROVISIONS OF THE NEW YORK STATE LABOR LAW FOR FAILURE TO PAY MINIMUM AND STRAIGHT-TIME WAGES
**(On behalf of Plaintiff Palaguachi, Plaintiff Santiago, Plaintiff Radwan, Plaintiff Lilly, Plaintiff Steele, Plaintiff Moyle, Plaintiff Welch, and Plaintiff Payne, and all similarly situated employees)**

252.   Plaintiffs and all similarly situated employees repeat and reallege all paragraphs above as though fully set forth herein.

253.   As detailed above, the Plaintiffs and the Class were qualified to work as a Package Delivery Driver.

254.   Upon information and belief, Defendants, in violation of NY Lab. Law § 190 et seq. and supporting regulations of the New York State Department of Labor failed to pay Plaintiffs, the Class, and all similarly situated employees overtime compensation at rates of one and one-half times the regular rate of pay for each hour worked more than forty (40) hours in a workweek.

255.   Upon information and belief, the Defendants failed to pay Plaintiffs, the Class, and all similarly situated employees overtime compensation was willful within the meaning of NY Lab. Law § 663.

256.   Upon information and belief, Plaintiffs, the Class, and all similarly situated employees are entitled to recover from Defendants their unpaid overtime wages, liquidated damages as provided for by the NYLL, reasonable attorneys' fees and costs, and pre-judgment and post-judgment interest.

## THIRD CAUSE OF ACTION
### VIOLATION OF THE NOTICE AND RECORDKEEPING REQUIREMENTS OF THE NEW YORK LABOR LAW

37

Case 1:25-cv-05548-DG-CHK    Document 1-2    Filed 10/02/25    Page 39 of 45 PageID #: 114

**(On behalf of Plaintiff Palaguachi, Plaintiff Santiago, Plaintiff Radwan, Plaintiff Lilly, Plaintiff Steele, Plaintiff Moyle, Plaintiff Welch, and Plaintiff Payne, and all similarly situated employees)**

257.  Plaintiffs, the Class, and all similarly situated employees repeat and reallege all paragraphs above as though fully set forth herein.

258.  Upon information and belief, upon their hiring and throughout their employment, Defendants failed to provide Plaintiffs and all similarly situated employees with a written notice, in English, Spanish, or Arabic (Plaintiff's Palaguachi primary language), containing the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances; the regular payday designated by the employer; the name of the employer; any "doing business as" names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address if separate; and telephone number of the employer, as required by NYLL § 195(1).

259.  Upon information and belief, the Defendants had numerous opportunities to cure this issue throughout their employment, but they never did. Defendants could have cured this during training, hiring, performance reviews, and payday.

260.  Upon information and belief, Plaintiffs, the Class, and all similarly situated employees are damaged in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### VIOLATION OF THE WAGE STATEMENT PROVISIONS OF THE NEW YORK LABOR LAW
**(On behalf of Plaintiff Palaguachi, Plaintiff Santiago, Plaintiff Radwan, Plaintiff Lilly, Plaintiff Steele, Plaintiff Moyle, Plaintiff Welch, and Plaintiff Payne, and all similarly situated employees)**

261.  Plaintiffs, the Class, and all similarly situated employees repeat and reallege all paragraphs above as though fully set forth herein.

262.  Upon information and belief, with each payment of wages, Defendants failed to provide Plaintiffs and all similarly situated individuals with an accurate statement listing each of the following: the dates of work covered by that payment of wages, the name of the employee, the name of employer; address and phone number of the employer; rate or rates of pay as basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; net wages; the

38

Case 1:25-cv-05548-DG-CHK    Document 1-2    Filed 10/02/25    Page 40 of 45 PageID #: 115

regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked; and the number of overtime hours worked, as required by NYLL § 195(3).

263.    Upon information and belief, due to Defendants' violation of NYLL, Article 6, § 195(3), Plaintiffs, the Class, and all similarly situated employees are entitled to statutory penalties of two hundred fifty dollars for each workweek that Defendants failed to provide them with accurate wage statements, or a total of five thousand dollars, and reasonable attorneys' fees and costs as provided for by NYLL, Article 6, § 198(1-d).

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request that this Court enters judgment against Defendants by:

a) Designating this action as a collective action and authorizing prompt issuance of a notice according to N.Y. CLS CPLR § 901 to all putative class members apprising them of the pendency of this action and permitting them to promptly file consents to be Plaintiffs in the NYLL claims in this action;

b) Declaring that Defendant UPS violated the minimum wage provisions of, and rules and orders promulgated under, the NYLL as to Plaintiffs and all similarly situated employees;

c) Declaring that Defendant UPS violated the overtime wage provisions of, and rules and orders promulgated under, the NYLL as to Plaintiffs and all similarly situated employees;

d) Declaring that Defendant UPS violated the timely payment provisions of, and rules and orders promulgated under, the NYLL as to Plaintiffs and all similarly situated employees;

e) Declaring that Defendant UPS violated the notice and recordkeeping requirements of the NYLL concerning Plaintiffs and all similarly situated employee's compensation, hours, wages, and any deductions or credits taken against wages;

f) Awarding Plaintiffs and all similarly situated employees' damages for the amount of unpaid minimum wage and overtime compensation, and any improper deductions or credits taken against wages, as well as awarding spread hours pay under the NYLL as applicable;

g) Awarding Plaintiffs and all similarly situated employees' damages for Defendants' violation of the NYLL notice and recordkeeping provisions, according to NYLL §§ 198(1-b), 198(1-d);

h) Awarding Plaintiffs liquidated damages in an amount equal to one hundred percent (100%) of the total amount of minimum wage, overtime compensation, and spread of hours pay

39

INDEX NO. 503187/2024
RECEIVED NYSCEF: 01/31/2024

Case 1:25-cv-05548-DG-CHK    Document 1-2    Filed 10/02/25    Page 41 of 45 PageID #: 116

shown to be owed according to NYLL § 663 as applicable; and liquidated damages according to NYLL § 198(3); and

i) Providing that if any amounts remain unpaid upon the expiration of ninety (90) days following issuance of the judgment or ninety (90) days after expiration of the time to appeal and no appeal is then pending, whichever is later, the total amount of judgment shall automatically increase by fifteen (15%) percent, as required by NYLL § 198(4); and

All such other and further relief as the Court deems and proper.

### <u>JURY DEMAND</u>

Plaintiffs and all similarly situated employees demand a jury trial on all issues triable by a jury.

Dated: Brooklyn, New York
January 28, 2024

By:  Tyrone A. Blackburn, Esq.

_____ /s/ Tyrone Blackburn_____

40

Case 1:25-cv-05548-DG-CHK    Document 1-2    Filed 10/02/25    Page 42 of 45 PageID #:
117

## PRESERVATION NOTICE

The term "you," "your," or "yours" as used herein shall refer to you (the recipient of this letter), as well as to the respondents, and any individuals responsible for the custody and control of the below information, including, but not limited to, those individuals' administrative assistants, secretaries, agents, employees, information technology personnel and third-party vendors. You are directed from this point forward to prevent any "spoliation," defined as altering, changing, updating, destroying (even if periodically), editing, or deleting any of the information set forth hereafter.

If you cause any such alteration, destruction, or change, direct it or allow it to occur, you may be charged with discovery rule violations for which sanctions may be imposed. Further, your failure to abide by this request could result in severe penalties against you and form the basis of legal claims for spoliation.

Electronically Stored Information:

In terms of electronically stored information, you are directed to prevent any destructive, alternative or other change to any web pages, virtual profiles or identical (including, but not limited to, Facebook, Instagram, Pinterest, Twitter, Tumblr, LinkedIn, Snapchat, Google Plus+, Flickr, Vine, About.me, ask.fm etc., or any other social media-based web profile or networking site account), emails, voice messages, text messages, instant messages or messaging systems, recordings, digital recordings, media images and videos, temporary memory, memory sticks, portable memory devices, laptops or computers, CDs, DVDs, USB devices, databases, computer activity logs, internet browsing history (including cookies), network access and server activity logs, word processing files and file fragments, backup and archival files, imaging and facsimile files, electronic calendar and scheduling program files and file fragments as well as any other contact and relationship management data (e.g., Outlook), electronic spreadsheet files and file fragments, pertaining in any way to this controversy of the parties or any potential witnesses. This includes a request that such information not be modified, altered, or deleted due to data compression or disk fragmentation (or other optimization procedures), which processes you are hereby directed to suspend until that data can be preserved, copied, and produced.

You are directed not to modify, alter, or delete or allow modifications, alterations, or deletions to be made to any such electronically stored information. You are further directed to preserve all, and not to destroy any, passwords, decryption productions (including, if necessary, the software to decrypt the files), network access codes, manuals, tutorials, written instructions, decompression or reconstruction software, and any other information and things necessary to access, view and (if necessary) reconstruct the electronic data we will request through discovery.

Paper Information:

In terms of the paper information, you are directed to preserve any and all emails, videos, texts, memos, reports, documents, notes, correspondence, photographs, investigative information, or other documents which pertain in any way to the controversy, parties, or witnesses in this matter. Through discovery, we expect to obtain from you a number of documents and other data, including text messages, emails, photographs, and other information stored on computers, electronic devices, and telephones.

Although we may bring a motion with a court for order-preserving documents and other data from destruction or alteration, your obligation to preserve documents and other data for discovery on this case arises independently from any order on such motion. Electronic documents and the storage media, including but not limited to telephones on which they reside, contain relevant, discoverable information beyond what may be found in printed documents. Therefore,

41

Case 1:25-cv-05548-DG-CHK    Document 1-2    Filed 10/02/25    Page 43 of 45 PageID #: 118

even where a paper copy exists, we are likely to seek all documents in their original, electronic form, along with metadata or information about those documents contained on the media. We will seek paper printouts of only those documents that contain unique information created after they were printed (e.g., paper documents containing handwriting, signatures, marginalia, drawings, annotations, highlighting, and redactions) and any paper documents for which no corresponding electronic files exist.

The laws and rules prohibiting the destruction of evidence apply to electronically stored information in the same manner that they apply to other evidence. Due to its format, electronic information is easily deleted, modified, or corrupted. Accordingly, the demand is made that you take every reasonable step to preserve this information until the final resolution of this matter. This may include, but would not be limited to, an obligation to discontinue all data destruction and backup tape recycling policies.

Concerning electronic data created after the date of delivery of this letter, relevant evidence should not be destroyed. You must take the steps necessary to avoid the destruction of such evidence.

Brooklyn, New York

Dated: January 28, 2024

By: Tyrone A. Blackburn, Esq.

_____/s/ Tyrone Blackburn_____

## DEMAND FOR INSURANCE COVERAGE

Defendants are demanded to provide a complete copy of their applicable insurance policies and declaration sheets demonstrating coverage within thirty (30) days of service of this Complaint.

Brooklyn, New York

Dated: January 28, 2024

By: Tyrone A. Blackburn, Esq.

_____/s/ Tyrone Blackburn_____

Case 1:25-cv-05548-DG-CHK    Document 1-2    Filed 10/02/25    Page 44 of 45 PageID #: 119

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF KINGS**

| |
|---|

DANIEL MOYLE,
ROY WELSH,
CARLOS PALAGUACHI,
ROBERT SANTIAGO,
AHMED RADWAN,
TYLER LILLY,
TRAVIS STEELE,
and
WARREN PAYNE,
*individually and on behalf of others similarly situated,*

                      Plaintiffs,

       -against-

UNITED PARCELS SERVICE, INC.
                    Defendant

Index Number:
**Plaintiff designates**
**Kings County**
**as the venue for trial.**

**CERTIFICATE OF MERIT**

To the above-named defendant (s):

      TYRONE A. BLACKBURN, being duly sworn, deposes and states the following to be true under the penalties of perjury of the State of New York. I have reviewed the facts of this case and have, and I have concluded, based on the review, that there is a reasonable basis for the commencement of this action.

Brooklyn, New York
Dated: January 28, 2024

                    By: Tyrone A. Blackburn, Esq.

                    _____/s/ Tyrone Blackburn_____

43

Case 1:25-cv-05548-DG-CHR    Document 1-2    Filed 10/02/25    Page 45 of 45 PageID #: 120

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF KINGS**

DANIEL MOYLE,
ROY WELSH,
CARLOS PALAGUACHI,
ROBERT SANTIAGO,
AHMED RADWAN,
TYLER LILLY,
TRAVIS STEELE,
and
WARREN PAYNE,
*individually and on behalf of others similarly situated,*

Plaintiffs,

-against-

UNITED PARCELS SERVICE, INC.

Defendant

Index Number:
**Plaintiff designates**
**Kings County**
**as the venue for trial.**

**ATTORNEY VERIFICATION**

To the above-named defendant (s):

TYRONE A. BLACKBURN, an attorney duly admitted to practice in the Courts of New York State, and a member of the firm T. A. BLACKBURN LAW, PLLC., attorney for the plaintiff in the within action, hereby affirms under penalty of perjury: That he has read the within the complaint and knows the contents thereof, and that the same is true to his own knowledge, except as to the matters therein stated to be alleged upon information and belief, and that as to those matters, he believes it to be true. The sources of his information and knowledge are investigations and records in the file. The reason this verification is made by affirmation ant and not by the plaintiffs is that the Plaintiffs are not within the County where the attorney has his office.

Brooklyn, New York
Dated: January 28, 2024

By:  Tyrone A. Blackburn, Esq.

_____/s/ Tyrone Blackburn_____